*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re WICKE/ARMSTRONG, Minors.

UNPUBLISHED
October 13, 2022

No. 360289
Iron Circuit Court
Family Division
LC Nos. 19-000015-NA
　　　　　20-000022-NA

Before: MARKEY, P.J., and SAWYER and BOONSTRA, JJ.

PER CURIAM.

Respondent mother ("respondent") appeals from an order of the circuit court terminating her parental rights to the minor children. We affirm.

Trial was conducted in this matter on October 13 and 14, 2021, resulting in the termination of both parents' parental rights.[1] This appeal only concerns the termination of the mother's parental rights to the two minor children, CW and AA. The first witness called was Paul Eyke, a clinical psychologist employed by Northpoint Behavioral Health Services. He served as respondent's therapist from January of 2020 through the time of trial, meeting with her 37 times. Eyke testified that respondent had been referred to Northpoint because of a substance abuse history and mood disorder issues and that respondent was consistent in attending their meetings. Eyke stated that respondent denied any current use of substances other than marijuana, which she used to address migraines. Eyke further testified that respondent did not show signs of a mood or thought disorder and appeared mentally stable. Their sessions focused on issues related to gaining custody of her children. In addition to the two children at issue in this case, respondent has three older children to which she told Eyke that she had relinquished her parental rights to her brother before she went to jail for domestic violence. In Eyke's opinion, respondent had "substantially addressed" her substance abuse problems and had also addressed her mental health problems. He

---

[1] Although a joint trial, the trial court first heard testimony regarding the father's rights and ruled to terminate the father's rights and then turned to hearing testimony regarding the mother. Although the father, Blake Wicke, plays a large role in this case and the termination of respondent's parental rights, the termination of Wicke's parental rights is not at issue in this appeal.

further testified that he did not have any concerns with respondent being able to provide appropriate care for the children.

Next, Alexandra Constantini, an infant mental health therapist, testified regarding the services she provided to the children. Constantini testified that she has observed respondent making progress in her actions with CW, such as reasoning with him in an age-appropriate manner and setting and enforcing limits. In addition to showing improvement in her parenting abilities and being able to care for the children, respondent was very consistent in attending appointments with Constantini.

Amanda Clouthier from UP Kids testified regarding supervised visitations and other services that were provided. She testified that, while respondent had some challenges with various skills, such as properly strapping the children into car seats, she was open to assistance and did show improvement in developing those skills. Clouthier stated that she had "mild concerns" about respondent's ability to parent.

Next to testify was Jay Petroski, a peer support specialist and recovery coach at Northpoint Behavior Health. His work with respondent started with the three older children for whom respondent's parental rights had been terminated before the births of CW and AA. As with Constantini and Clouthier, Petroski testified that he saw improvement with respondent during the time that he worked with her. Specifically, that she has handled her substance abuse issues (except for marijuana), anger management, and controlling her moods and emotions. He further testified that respondent has "changed tremendously" since the termination of her parental rights to her older children and that "the same conditions did not exist now." He testified that he began seeing changes in respondent three years previous to the trial and "noticed real significant changes in her attitude, behaviors, et cetera" about two years previous.

The next witness was Polly Moon, respondent and her mother's neighbor. She testified that she saw Blake Wicke within the previous month at respondent's house and that she called the sheriff. In fact, she testified that she had seen Wicke at respondent's house every day for the past six months. She further testified to hearing frequent fighting between Wicke and respondent. She also testified that respondent was frequently babysitting a child, whom she often saw outside unsupervised. She also testified that two months before the trial, the police and an ambulance arrived at respondent's residence in response to a 911 call that Wicke had assaulted respondent.

Respondent also testified. She testified that she was employed for the past two weeks as a cook at a restaurant and before that did babysitting six days a week for a six-year-old. The babysitting was performed at either the child's home or at respondent's mother's home. She confirmed that Blake Wicke is the biological father of both children. She also acknowledged that there was a court order prohibiting her from having contact with Wicke because she was on probation for a domestic assault against Wicke and that she has violated that order. She stated that the last time that she had contact with him was earlier that year on Memorial Day when she called the police after Wicke assaulted her. She stated that she had not seen Wicke at all between the time AA was conceived and the Memorial Day incident. She testified that she had stopped using drugs, except for marijuana for which she had a medical marijuana card. She also testified that there is a teenaged son of a friend of hers who is often at her house and that the boy resembles Blake Wicke. She attributes the sightings of Wicke at her house as actually people seeing the boy.

Michelle Christunas testified that she was respondent's foster care worker for approximately the previously two years. Her involvement began shortly before respondent's parental rights to her older children were terminated. She testified that the parent-agency treatment plan that was established set the goals of addressing respondent's substance abuse, emotional stability, housing, resource availability, management, and parenting skills. The plan was established after CW was born, but before AA was conceived. Christunas testified that in the 11 months prior to the birth of AA, respondent had not made any significant progress, which resulted in AA being removed at the time of birth. AA tested positive for marijuana at the time of her birth. She believed that CW had also tested positive for marijuana at the time of his birth. She stated that the reason that unsupervised visitations with the children were not allowed was because of the contact with Wicke, that respondent was not demonstrating the ability to read her children's cues, was not demonstrating the ability to implement the techniques that she was learning in the parenting classes, and being able to discipline CW. She testified that respondent has "made some improvement" in handing basic care tasks, such as feeding and bathing the children. She was also concerned about respondent being untruthful to her about "mundane" facts like how much the children had eaten, and had prompted CW to lie to the case worker.

With respect to substance abuse, the parent-agency agreement would include abstaining from marijuana, which she continued to use. She did at some point obtain a medical marijuana card. According to Christunas, the children have developed a strong bond with their foster mother and, in Christunas' opinion, the children will be negatively impacted if returned to respondent. Specifically, Christunas explained that she was "very concerned that if these kids were to return home that [respondent] would be at her mother's house, that Blake would be in and out, and there's a possibility that these kids could be seriously harmed, but not just physically but emotionally." She agreed that, based on her involvement with the family, there was no reasonable expectation that respondent would be able to provide proper care and custody within a reasonable time period in light of the children's ages. She also stated that she believed that there was a potential risk of harm if the children were returned based upon respondent's history with the older children and the ongoing reports that Wicke is involved in respondent's life. She noted that respondent had been provided with services beginning with the older children in 2015 (five years before the trial in this case) and respondent still had not made sufficient progress to allow for unsupervised visitations.

Christunas also stated why she did not believe that it was in the children's best interests to be returned to respondent:

> Basically, [respondent] has been involved with this Department since 2015. She has been offered a multitude of services from mental health, substance abuse, Eyes On Med, Families First, reunification services, probation, domestic violence, parenting, different sorts of parenting stuff, and I'm going to forget to name a few. And although there has been some slight progress in some of these areas, there's still, and even the service providers testified today that they are concerned about her having contact with Blake, and it seems like no matter what the Court orders her, that's not going to stop her. And a lot of times the stuff, and if you look at the facts that she put her own wants ahead of her children's needs.

It is important to note that Christunas' had a basis for believing that respondent continued to have contact with Wicke. Specifically, she testified that Wicke's grandmother told her that respondent

was driving him and picking him up at the grandmother's house as recently as December of 2020, and had been doing so "for a long period of time." Christunas also spoke with the person renting Wicke's father's home who also reported seeing respondent driving Wicke back and forth. She also referenced the incident in which the police were called, where the police did not find Wicke but did find some of his clothing in the house. She also referenced two times in 2020, July and September, when the police observed respondent with Wicke.[2]

Iron County Sheriff's Deputy Robert Reid testified that he was familiar with both respondent and Wicke in regards to his professional duties. He stated that he has asked respondent numerous times where Wicke was living, and was told at various times either with respondent or with Wicke's grandmother.[3] He was also a responding officer who conducted a partial search of respondent's mother's home[4] and discovered the items that belonged to Wicke in one of the bedrooms.[5]

At the end of the trial, the trial judge gave a lengthy, detailed opinion from the bench. The trial court expressed concerns about respondent's dishonesty, particularly with respect to contact with Wicke, rejecting the "mistaken identity" claims by respondent. The trial court also commented on the length of time that the children have been in foster care and the even longer period of time that respondent has been receiving services:

> The other thing that strikes me is that it's been over 900 days, over 900 days since [CW] was removed, and over 300 days since [AA] was removed. But that doesn't even tell the whole story because [respondent] was receiving services during the entire time she was here with the three [older] children.
>
> The truth is [respondent's] been receiving services continuously since 2015. And I believe she has made progress. I believe particularly she's made progress in her area of mental health where Mr. Eyke said she made dramatic improvement. But in the other areas the progress that she's made in the last six years is the sort of progress that you would expect in 30 days. You know, it wouldn't take 30 days for a parent to learn how to bottle feed a child, and to know the difference between when the child is full and when the child is simply taking a break to look around

---

[2] Blake Wicke did appear briefly via Zoom on the second day of trial. He testified that, before and following the Memorial Day incident, he had been in Florida and Louisiana. He had also spoken the evening before with his grandmother, who told him that she had never made a statement about Wicke being with respondent during that time frame.

[3] Deputy Reid explained that the interest in locating Wicke was based upon there being multiple outstanding warrants for his arrest.

[4] Deputy Reid explained that it was only a partial search because the search was based upon consent and respondent's mother withdrew consent before one of the upstairs bedrooms was entered and she ordered them to leave.

[5] Respondent's mother also testified regarding the items, explaining that items were from the apartment respondent and Wicke shared prior to their incarceration and eviction.

their environment before they resume eating again. And [respondent] misses those cues. And I think about if I chose not to terminate [respondent's] parental rights today, I'm certain we would still be here a year from now because the progress that she's made is so slow.

The court also observed while it believed that respondent does deeply love her children, there were still instances where respondent would take actions that would impact her ability to get the children back, such as violating court orders. The trial court also addressed the continued contact with Wicke:

And she . . . consistently had contact with Blake Wicke. And this is a man, not a 15 year old boy that they're trying to say people are mistaking him for, this was a man who was convicted of possession of meth, has an outstanding charge of possession of meth, and an outstanding domestic violence charge on [respondent], who's been fleeing the law ever since for over a year trying to hide from getting caught. And I've got reliable people, reliable in the sense of who they are and what their jobs are, but also reliable in the sense that they know who [CW] is—or I'm sorry—Blake Wicke is. They know him. The probations officer, Amelisa Arcan, had Blake Wicke on probation. She knows what he looks like and she reported seeing him in a car with [respondent]. Linda Wizinski was Mr. Wicke's counselor. She knows him. And she reported seeing him in a car with [respondent]. And we have police officers who have reported seeing them together. And I've got a neighbor who testified that there's been no improvement in the situation at [respondent's] mother's house. That they're still outside in the yard yelling at each other. That [respondent] is not watching this child she's supposed to be babysitting; he's out in the yard playing by himself. And that Blake Wicke is in and out of there all summer. And I understand Mr. Wicke's testified he fled to Florida and that he only came back for a couple of days and then fled to Louisiana, but I don't believe anything Mr. Wicke says.

The trial court found that reasonable efforts had been made to reunify the family, but that those efforts were unsuccessful. The trial court further found that 180 days had passed since the initial disposition and that there was clear and convincing evidence that the conditions that lead to adjudication continue to exist. The court also found that there was no reasonable likelihood that those conditions would be rectified within a reasonable time. The court also concluded that other conditions existed that caused the children to come within the court's jurisdiction that have not been rectified and that there was no reasonable possibility that they would be rectified within a reasonable time. In particular, the continuing contact respondent had with Blake Wicke. Additionally, the court found that respondent, despite having the ability to do so, has failed to provide proper care and custody for the children and that there was no reasonable expectation that she would be able to do so within a reasonable time. The court also concluded that returning the children to the home would put them in danger:

And finally I find, most importantly, that there's a reasonable likelihood, based on the capacity of [respondent], as well as her conduct, that the children will be harmed if they are returned to her home. And as I indicated initially, as we sit

here today, knowing everything I know about this file, I am afraid to have her unsupervised visits at this time, let alone return the children to her home.

After finding that the grounds for termination existed, the trial court then reviewed the best interest factors. The trial court concluded that "overall in reviewing these best interest factors and taking into account the need for permanency from the children, I do find it's in the best interests of the children to terminate their mother's parental rights.

Turning to the issues raised on appeal, we review for clear error the trial court's finding that there is clear and convincing evidence that the statutory grounds for termination exists. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). Clear error exists if, after reviewing the entire record, we are left with a definite and firm conviction that a mistake was made. *Id*. at 41. Furthermore, we give deference to the trial court's ability to judge the witnesses' credibility. *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009).

The trial court found that three grounds for termination existed. It is only necessary that one of the grounds was established. Respondent first argues that the trial court erred when it concluded that grounds for termination under MCL 712A.19b(3)(c)(i) and (ii) existed. We disagree. MCL 712A.19b)(3)(c) provides as follows:

> The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (i) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> (ii) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

As noted above, the trial court found both alternatives under 19b(3)(c) existed. Respondent's argument on this issue generally centers on two disagreements with the trial court's conclusions. First, respondent argues that she has, in fact, made progress towards rectifying the conditions that lead to the court's assuming jurisdiction. Even the trial court concedes that this is true, but that the progress was insufficient and was proceeding too slowly. That is, that the conditions had not been sufficiently rectified and would not be within a reasonable time. In light of the testimony summarized above, we cannot say that the trial court erred in that conclusion. The second point that respondent takes issue with is the trial court's conclusion regarding her continued contact with Wicke. While there was certainly conflicting testimony on that point, we must give deference to the trial court's ability to judge the credibility of the witnesses. And the trial court clearly found the testimony supporting continued contact to be more credible. We cannot say that the trial court clearly erred on this point.

While it is sufficient that the trial court did not err in concluding that grounds existed under MCL 712A.19b(3)(c), we will also briefly consider its conclusion that grounds also existed under MCL 712A.19b)(3)(g), which provides as follows:

> The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

Respondent's argument on this point largely repeats her previous argument, disagreeing with the trial court's conclusion that insufficient progress had been made and that she had had contact with Wicke. Again, we cannot conclude that the trial court erred in reaching this conclusion.

Respondent also argues that the trial court erred in concluding that grounds exist under MCL 712A.19b(3)(j), which provides as follows:

> There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The trial court's conclusion on this point was supported by the testimony of Michelle Christunas. Respondent's brief argument on this point is again a disagreement with the conclusion that she had continued contact with Wicke. As discussed above, evidence was presented on both sides and the trial court concluded that the evidence that there was continuing contact was more credible. We cannot say that the trial court erred.[6]

Affirmed.

/s/ Jane E. Markey
/s/ David H. Sawyer
/s/ Mark T. Boonstra

---

[6] Indeed, this ground itself would be more than sufficient to uphold the trial court's decision in light of respondent's brief and ineffective argument that the trial court erred on this issue.